VIETNAMESE BUDDHISM STUDY TEMPLE IN AMERICA a/k/a/ Chua Quan Am, and Tri Nguyen Thich a/k/a/ Thich Dao Quang, Plaintiffs,

v.

CITY OF GARDEN GROVE, et al., Defendants.

No. SACV06 728 CJC(RNBX).

United States District Court, C.D. California, Southern Division.

Oct. 20, 2006.

Belinda Escobosa Helzer, Hector O. Villagra, Nora Adriana Preciado, ACLU Foundation of Southern California, Orange, CA, for Plaintiffs.

M. Lois Bobak, Woodruff Spradlin & Smart, Orange, CA, for Defendants.

## ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

CARNEY, District Judge.

### I. INTRODUCTION

The Vietnamese Buddhism Study Temple in America (a/k/a Chua Quan Am) (the "Temple") and its spiritual leader, Abbot Thich Dao Quang (a/k/a Tri Nguyen Thich) (the "Abbot") seek a preliminary injunction against the City of Garden Grove [1] to allow the Abbot and his devoted congregation to assemble and practice their Buddhist faith on the property the Temple owns in the city. After carefully considering the evidence presented by the parties, the Court finds that the issuance of a preliminary injunction, limited in scope and duration, is appropriate and necessary. The Temple has shown that the City's zoning ordinance discriminates between religious assemblies and nonreligious assemblies. Specifically, the City permits nonreligious assemblies to operate as a matter of right in zones where religious assemblies are completely forbidden. One of these zones is the office professional zone where the Temple's property is located. The Temple has also shown that the Abbot and his congregation are suffering substantial hardship by being denied their First Amendment right to practice their faith peaceably on the Temple's property. The City can currently impose criminal and civil liability against any member of the Temple simply for practicing the Buddhist faith on the Temple's property.

1. The defendants in this action are the City of Garden Grove ("City" or "Garden Grove"); the City Council of the City of Garden Grove ("City Council"); the City of Garden Grove Planning Commission ("City Planning Commission" or "Commission"); William Dalton, in his individual and official capacity as Mayor of Garden Grove; Mark Rosen, Harry Krebs, Mark Leyes, and Janet Nguyen, in their individual and official capacities and members of the City Council; Larry Callahan, Steve Jones, Roland Chi, Nick Lecong, and Jerry Margolin, in their individual and official capacities as members of the City Planning Commission; Matthew Fertal, in his individual and official capacity as City Manager for the City; and Does 1 through 10. In this order, "City" and "Garden Grove" will refer to the city itself, and to all defendants collectively.

In response to this threat, the Abbot has been forced to completely shut down his services, even though they cause no harm to the community, do not create any noise or disturbance in the neighborhood, and do not pose a threat to the health and safety of the citizens of Garden Grove. To protect the First Amendment rights of the Abbot and his congregation to freely practice their religion, the Court must preliminarily enjoin the City from enforcing the zoning ordinance against them.

## II. FACTUAL BACKGROUND

### A. History of the Temple

The Abbot, a Vietnamese refugee, is a devout follower of the Pure Land school of Buddhism. Verified Complaint ¶¶ 22, 24 ("Compl."). Pure Land is a more conservative, orthodox style of Buddhism that emphasizes faith, prayer, study, good works, and devotional chanting. *Id.* Pure Land teaches its practitioners to utilize the basic Buddhist principles of selflessness, patience, equanimity, generosity, and compassion for the benefit and fulfillment of others. *Id.* The Abbot's reputation for orthodoxy in this school of Buddhism has attracted a devoted group of monks and nuns (referred to as the Temple's *sangha*), as well as a large community of lay followers. Compl. ¶ 23. Many of the Temple's congregation hold the Abbot in especially high esteem due to a struggle during his escape from Vietnam by boat in 1986, when he was beaten and stabbed while trying to protect women on board from being raped by pirates. Declaration of Khanh–Van Nguyen ¶ 4; *see also* Christopher Goffard, *Buddhist Temple Sues to Worship*, L.A. TIMES, Aug. 10, 2006 (Orange County Edition), at B1.

The Abbot founded the Temple in 1999. Compl. ¶ 22. The religious practice of the Temple is one strongly centered in concepts of community. The Temple's *sangha* believe that they should pray, meditate, chant, and read the *sutras* (Buddhist spiritual scriptures) together with each other and the Abbot. Compl. ¶ 25. Much of the daily ritual schedule for the *sangha* is designed to be performed as a community. Compl. ¶ 26. This includes morning meditation, several recitations of the Pure Land *sutras*, all meals (which have spiritual and ritualized components), and offerings of devotions to departed ancestors.[2] *Id.*

Prior to 2005, when it suspended operations, the Temple provided a wide range of services to the lay community. Congregants were invited to participate in several of the daily rituals along with the *sangha*. Compl. ¶ 29. Weekend services were held every Sunday. Compl. ¶ 30. The Abbot and the *sangha* conducted special religious ceremonies, such as funerals, memorial services, and weddings. Compl. ¶ 27. They held special ceremonies celebrating the changing of the seasons. Compl. ¶ 29. The congregation was invited to regular *sam hoi*, a repentance ceremony held on the new and full moons. Compl. ¶ 30. The Temple and the Abbot acted as custodian over the spirits of the lay followers' departed ancestors. Compl. ¶ 29. Also, the Temple ran a youth group that taught children about both Buddhist doctrine and history, as well as Vietnamese language and culture. Compl. ¶ 32. As a result of the veneration for the Abbot and the desire to participate in these services as part of the Temple community, the Temple established a monastic family of seven monks and five nuns, and a larger lay following of around 300 people. Compl. ¶ 5.

---

2. The Temple's congregants entrust the Temple and the Abbot with pictures of their family members who have died. Declaration of Dang Quoc Khanh ("Dang Decl.") ¶ 9. They believe that this will ensure that the spirit of their ancestors will be looked after on a daily basis. *Id.*

When the Abbot first established the Temple, it operated exclusively out of a ranch-style house in a residential neighborhood in Garden Grove. Compl. ¶ 33. By 2003, not only had the Temple's congregation outgrown the house, but it had drawn complaints from neighboring residents about the increase in traffic, loss of parking, and noise caused by the Temple's operation. *Id.* In order to avoid a legal dispute with the neighbors or the City, the Temple sought a new property that would serve as a monastery for the *sangha* and place of worship for the community. *Id.* They found an available 1.8 acre parcel, currently improved with a one-story medical office building, at 10510 Chapman Avenue in Garden Grove, at the intersection with Nutwood Street ("Chapwood Property"). Compl. ¶ 34. Thanks to a generous loan from Anthony Giang, a lay follower, the Temple was able to acquire the property. Declaration of Anthony Giang ("Giang Decl.") ¶ 7. Mr. Giang purchased the property for just under $2 million in February 2004, and transferred title to the Temple in June 2004. Giang Decl. ¶ 8.

## B. The Garden Grove Zoning Plan

Title 9 of Garden Grove's Municipal Code (the "GGZO") implements the zoning plan for the city of Garden Grove. Overall, the city is divided into ten zoning districts. *See* GGZO § 9.04.050. For each of those districts, the GGZO indicates which uses will be permitted as a matter of right, and which uses will be permitted only through a conditional use permit ("CUP"). *See* GGZO § 9.08.030. Garden Grove's zoning scheme is permissive; any use not specifically permitted is prohibited. *Id.* Churches and religious centers are not permitted as a matter of right in any of the ten zoning districts. *See id.* They are permitted in four zones if they first obtain a CUP from the City: R–1 (single-family residential), R–2 (limited multiple residen-

tial), R–3 (multiple-family residential), and O–S (open space). *Id.*

In order to obtain a CUP, a religious center must meet several enumerated conditions, including a minimum lot size of 1 acre, specific setbacks, sufficient parking, and access from at least one public street. GGZO § 9.08.050(10). Once the church meets those conditions, the City must then make several findings before the CUP can be issued. GGMC § 9.24.030(D)(4)(b). The church (1) must be consistent with the city's adopted general plan; (2) must not adversely affect the health, peace, comfort, or welfare of persons residing or working in the surrounding area; (3) must not unreasonably interfere with the use, enjoyment, or valuation of surrounding property; and (4) must not jeopardize or endanger the public health, safety, or general welfare. *Id.* The City must also find that the site is adequate in size and shape to accommodate the special conditions and restrictions applicable to churches, and that the site is adequately served by public streets or highways and the required public or private service facilities. *Id.* The hearing body is instructed to deny applications for a CUP if the applicant fails to provide sufficient evidence to support these findings. *Id.*

Private clubs and other secular meeting facilities receive much different treatment under the GGZO. They are permitted as a matter of right in four zones: O–P (office professional), C–1 (neighborhood commercial), C–2 (community commercial), and O–S. Private clubs do not need to obtain a CUP to operate in any of these four zones. GGZO § 9.08.030. Private clubs are additionally permitted in the R–3 zone, provided they first obtain a CUP. *Id.*

The Chapwood Property purchased by the Temple is located in an O–P zone. Churches and religious centers are wholly prohibited from locating in O–P zones.

Thus, in order to use the existing facility as a religious temple, and get ultimate approval to construct a new facility on the site, the Temple first needed a general plan amendment to the GGZO, changing the zone of the Chapwood Property from O–P to R–1. *See* GGZO § 09.24.030(D). Once the Chapwood Property was zoned residential, the Temple then needed a CUP in order to operate or construct a religious center on that site. When considering a general plan amendment, the City must make three threshold findings: (1) that the amendment is consistent with the goals, objectives, and elements of the general plan as a whole; (2) that the amendment promotes the public interest, health, safety, and welfare; and (3) that the property is physically suitable for the requested land use designation, compatible with surrounding uses, and consistent with the general plan. GGZO § 9.24.030(D)(1)(b).[3]

## C. The Temple's Land Use and Zoning Applications

The Temple filed its first application with the City Planning Commission in December 2004. Compl. ¶ 45. This application requested that the general plan be amended to change the designation of the Chapwood Property from Office Professional to Low Density Residential, and that the property be re-zoned R–1. *Id.* The Temple also sought approval of a Site Plan[4] for the construction of a 15,000 square foot, two-story temple on the property, and a CUP for the operation of a religious facility. *Id.* During the preliminary stages of the application, the City identified concerns about the potential traffic problems a temple facility might cause, as well as the loss of tax revenue the City would suffer.[5] Compl. ¶ 46. In response, the Temple commissioned a traffic study, showing that no improvements to the existing infrastructure would be required, and that the proposed project would have a negligible impact on overall traffic. Compl. ¶ 47 and Ex. A. The Abbot also agreed to compensate the City for any loss in property tax revenue it might suffer by permitting the Temple to occupy the Chapwood Property. Compl. ¶ 48. City staff initially recommended approval of the the Temple's requests, finding that the project met all the threshold requirements. Compl. ¶ 49. However, the Commission denied the request by a 2–2 vote. *Id.* The Temple appealed the decision to the City Council, which affirmed the denial. *Id.*

The Temple filed its second application in October 2005. Compl. ¶ 51. In that application, it reduced the proposed square footage and height of the temple building, and increased the number of on-site parking spaces available. Compl. ¶ 52. In order to further alleviate parking concerns expressed by the City, the Temple also agreed to provide a shuttle service to its congregants during the three major holiday celebrations of the Buddhist calendar.[6] Compl. ¶ 53. However, the Commission

---

**3.** The required findings for a zone change are similar. The City must find: (1) that the zone change is consistent with the general plan; and (2) that it will insure a degree of compatibility with surrounding properties and uses. GGZO § 9.24.030(D)(2)(b).

**4.** Approval of a Site Plan is required before a building permit can issue for any construction in a residential zone. *See* GGZO § 9.24.030(D)(3)(a). The City must make six required threshold findings before a Site Plan

can be approved. *See* GGZO § 9.24.030(D)(3)(b).

**5.** The Temple, as a non-profit organization, is exempt from property tax. *See* CAL. CONST. Art. XIII §§ 3, 5; CAL. REV. & TAX. CODE § 206.

**6.** These celebrations are Tet (Buddhist New Year), Buddha's Birthday, and Vu Lan (Ancestral Remembrance Day). Compl. ¶ 53. The Temple enjoys its greatest attendance figures during those celebrations.

once again denied the Temple's application. Compl. ¶ 54 and Exs. B, C. The Commission found that the Temple's proposal was not internally consistent with the goals and objectives of the City's general plan. Compl. Ex. B It cited specific compatibility problems posed by increases in traffic and on-street parking. *Id.* The Commission also held that use of the site as a temple would be inconsistent with the surrounding area, both in terms of architecture and intensity of use. *Id.* Finally, the Commission expressed a desire to retain the Office Professional designation of the Chapwood Property. *Id.* Again, the Temple appealed the decision to the City Council, which affirmed the denial in February of 2006. Compl. ¶ 56.

### D. Current Status of the Temple

While the first land use application was pending before the City Planning Commission, the City ordered the Abbot and the *sangha* to stop living and conducting services at the Chapwood Property. Compl. ¶ 50. City code enforcement officers occasionally visit the property to ensure that no religious practices are conducted there. Compl. ¶ 57. The Abbot and the *sangha* have rented a house near the Chapwood Property where they currently reside. Compl. ¶ 50. Since the City ordered the Abbot out of the Chapwood Property, he has discontinued religious services for the lay community and ceased the daily ritual practice of the *sangha*.[7] Compl. ¶¶ 58–61. The *sangha* no longer meditate or recite the *sutra* together, and the traditional spiritual purpose and benefit of their meals has been undermined. Compl. ¶ 63. The

Temple has also virtually eliminated its services for the lay community. Compl. ¶¶ 58–61. The Temple has held no prayer, meditation, or repentance sessions,[8] no weekend services, no holiday celebrations, and no special religious services, such as funerals or weddings. *Id.* Many lay supporters have refrained from associating with the Temple because they fear causing further hardship to the Temple. Dang Decl. ¶ 10; Declaration of Nguyen Van Hien ("Hien Decl.") ¶ 9; Declaration of Molan Doan ("Doan Decl.") ¶ 12. This has been especially problematic for those who believe that the Abbot and Temple are custodians of the spirits of their deceased ancestors. Dang Decl. ¶ 10; Hien Decl. ¶ 9. These congregants have been unable to visit the Temple to pay homage to those spirits, and are left feeling in derelict of their duty to their ancestors. Dang Decl. ¶ 10; Hien Decl. ¶ 9. The inability of the Temple to hold services for the congregation has also caused financial problems. Declaration of Abbot Thich Dao Quang ("Abbot Decl.") ¶ 10. The Temple relies heavily on donations and contributions, which have greatly reduced while services are not being performed. *Id.* There is a danger that if the Abbot cannot resume services soon, he will be forced to shut down the Temple altogether. Abbot Decl. ¶ 14.

### III. ANALYSIS

▉ The First Amendment to the Constitution provides every citizen with the right to practice his religion freely on his own property and to assemble peaceably

---

7. The GGZO provides: "Violation of any provision of this title or any condition of any permit, including but expressly not limited to any conditional use permit ... shall be a public nuisance and a misdemeanor." GGZO § 9.24.020. Thus the Abbot, the *sangha,* and the congregation are subject to misdemeanor liability if they are found conducting or par-

ticipating in religious services at either the Chapwood Property or the rental house.

8. According to the tenets of Pure Land Buddhism, prayer and meditation services should be held for lay practitioners at least once a day, and repentance sessions should be held at least twice a month. Compl. ¶ 59.

there with other members of his faith. James Madison, the author of the First Amendment, wrote that the "religion then of every man must be left to the conviction and conscience of every man; and it is the right of every man to exercise it as these may dictate. This right is in its nature an unalienable right." James Madison, *Memorial and Remonstrance Against Religious Assessments* (June 20, 1785), *reprinted in* 8 THE PAPERS OF JAMES MADISON 295, 299 (Robert A. Rutland et al. eds., 1973). In order to provide the necessary protection for this right, the government's power to interfere with or inhibit an individual's practice of his religious faith is highly limited. "The legitimate powers of government extend to such acts only as are injurious to others. But it does me no injury for my neighbor to say there are twenty gods, or no god. It neither picks my pocket nor breaks my leg." Thomas Jefferson, NOTES ON THE STATE OF VIRGINIA 159 (Query 17) (William Peden ed., Univ. of N.C. Press 1982) (1784). Any law burdening religious practice that is "not neutral or not of general application must undergo the most rigorous of scrutiny." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,* 508 U.S. 520, 546, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993) ("*Lukumi*").

In 2000, Congress passed the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), codified at 42 U.S.C. §§ 2000cc *et seq.* This law was designed to protect churches and religious assemblies from the effect of zoning laws that impermissibly discriminate against religious assemblies and interfere with the free exercise of religion. Congress recognized that it was essential for religious groups to have a place of worship where their members can congregate and practice their faith together. "The right to assemble for worship is at the very core of the free exercise of religion. Churches and synagogues cannot function without a physical space adequate to their needs and consistent with their theological requirements. The right to build, buy, or rent such a space is an indispensable adjunct of the core First Amendment right to assemble for religious purposes." 146 Cong. Rec. S7774–01, Exhibit 1 (daily ed. July 27, 2000) (joint statement of Senator Hatch and Senator Kennedy on the Religious Land Use and Institutionalized Persons Act of 2000). RLUIPA was enacted in response to congressional findings that churches and other religious assemblies were being discriminated against both on the face of zoning ordinances and by the discriminatory exercise of discretion by zoning boards. *See id.*

A city or county can violate RLUIPA in two distinct ways. First, governments may not "impose or implement a land use regulation in a manner that imposes a substantial burden on the religious exercise of a person, including a religious assembly or institution." 42 U.S.C. § 2000cc(a)(1). The most common violation of this provision occurs when a government makes "individualized assessments of the proposed uses for the property involved." *Id.* § 2000cc(a)(2)(C). Second, governments may not discriminate against religious assemblies through a land use regulation "that treats a religious assembly or institution on less than equal terms with a nonreligious assembly or institution." *Id.* § 2000cc(b)(1). The substantial burden provisions of § (a) and the nondiscrimination provisions of § (b) are "operatively independent of one another." *Civil Liberties for Urban Believers v. City of Chicago,* 342 F.3d 752, 762 (7th Cir.2003). Violation of either provision will result in liability against the government unless its conduct can survive strict scrutiny. *See* 42 U.S.C. § 2000cc(a)(1); *Midrash Sephardi, Inc.*

*v. Town of Surfside,* 366 F.3d 1214, 1232 (11th Cir.2004).

The Temple's complaint against the City seeks relief for violations of both provisions of RLUIPA. The Temple has also made various claims under the federal Constitution and the California Constitution, alleging violations of its rights to freedom of speech, freedom of assembly, and freedom of religion. As explained in more detail below, the Court finds that the Temple is entitled to preliminary injunctive relief by demonstrating serious questions on the merits of its equal terms claim. It is thus unnecessary for the Court to consider the Temple's likelihood of success on the merits of its other claims in this action.

### A. The Temple Is Entitled To A Preliminary Injunction

■ The standard for a preliminary injunction balances the plaintiff's likelihood of success against the relative hardship to the parties. *Sun Microsystems, Inc. v. Microsoft Corp.,* 188 F.3d 1115, 1118 (9th Cir.1999). To obtain a preliminary injunction here, the Temple must demonstrate either: "(1) a likelihood of success on the merits and the possibility of irreparable injury; or (2) that serious questions going to the merits were raised and the balance of hardships tips sharply in its favor." *Walczak v. EPL Prolong, Inc.,* 198 F.3d 725, 731 (9th Cir.1999). These two alternatives represent extremes of a single continuum, rather than two separate tests. *Nike, Inc. v. McCarthy,* 379 F.3d 576, 580 (9th Cir.2004) (*quoting Walczak,* 198 F.3d at 731). Thus, "the greater the relative hardship to the moving party, the less probability of success must be shown" to warrant injunctive relief. *Nat'l Ctr. for Immigrants Rights, Inc. v. I.N.S.,* 743 F.2d 1365, 1369 (9th Cir.1984).

### 1. The Balance of Hardships Tips Sharply in Favor of the Temple

■ The Temple has shown that it will suffer clear irreparable injury if the Abbot and his followers are barred from practicing their religion on the Chapwood Property. Every day the Abbot is forced to deny religious services to his congregation is a day that the Temple congregation is denied the First Amendment rights of freedom of speech, freedom of association, and free exercise of religion. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns,* 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) (*citing New York Times Co. v. United States,* 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971)). In the Ninth Circuit, "a party seeking preliminary injunctive relief in a First Amendment context can establish irreparable injury sufficient to merit the grant of relief by demonstrating the existence of a colorable First Amendment claim." *Warsoldier v. Woodford,* 418 F.3d 989, 1001 (9th Cir. 2005) (*quoting Sammartano v. First Judicial Dist. Court,* 303 F.3d 959, 973–74 (9th Cir.2002)). The plaintiff in *Warsoldier* was a prisoner who sought to enjoin the prison's grooming policy because his religion forbids him from cutting his hair. *Id.* at 991–92. The Ninth Circuit found that the prison's policy subjected Mr. Warsoldier to irreparable injury because it forced him to "choose between following his religious beliefs and suffering continual punishment, and abandoning his religious beliefs to avoid such punishment." *Id.* At 1001. Government imposition of such choices "puts the same kind of burden upon the free exercise of religion as would a fine imposed against appellant for her Saturday worship." *Sherbert v. Verner,* 374 U.S. 398, 404, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963).

Allowing the City to continue to enforce its zoning ordinance against the Temple and its congregants subjects them to the same burdensome choice as those in *Warsoldier* and *Sherbert*. The Abbot and his followers are subject to misdemeanor liability if they practice their faith at their chosen site of worship. *See* GGZO § 9.24.030. The injury caused by the City's zoning ordinance is especially burdensome because it impacts the free exercise of not just one individual, as in *Warsoldier* and *Sherbert*, but of all 300 members of the Temple's congregation. The Abbot has been forced to discontinue all services to his lay congregation, rather than incur multiple civil and criminal penalties imposed by the City. This has left the entire congregation without a place to worship, without a haven to seek spiritual guidance, and without the ability to pay homage to the spirits of their ancestors.[9] Simply put, the congregation has been completely denied their right to practice their faith in the manner of their choosing. The Temple has also suffered financial difficulties as a result of suspending services since the beginning of 2005. The Abbot declared that the continued existence of the Temple as a viable religious organization would be jeopardized if it were unable to resume services. The Temple has thus clearly demonstrated that it would suffer substantial and irreparable injury if an injunction were not issued.

The City certainly is not without hardship if an injunction were to issue. A court order enjoining Garden Grove from enforcing the GGZO against the Temple directly impacts the authority of the City to regulate land use within its borders.

This has the effect of limiting the City's use of its police power to impose regulations designed to protect the health, safety, and welfare of its citizens. However, the harm caused to the City is significantly decreased by the fact that this preliminary injunction is limited in duration, scope, and effect. Specifically, this injunction will have no effect on the City's authority with respect to all other landowners and all other parcels of land in Garden Grove. The City is only required to make the limited accommodations necessary to allow the Temple and its congregation to engage in some meaningful religious activity at the Chapwood Property. The impact of the injunction on the City's police power is minimal, particularly in comparison to the seriousness of the harm the Temple and its congregants suffer through the denial of their First Amendment rights. The balance of hardships thus clearly tips in favor of the Temple.

### 2. The Temple Has Raised Serious Questions Going to the Merits of Its Claims

 There are four elements of a violation of the equal terms provision of RLUIPA: (1) the plaintiff must be a religious assembly or institution, (2) subject to a land use regulation, that (3) treats the religious assembly on less than equal terms, with (4) a similarly situated nonreligious assembly or institution. *See Primera Iglesia Bautista Hispana of Boca Raton, Inc. v. Broward County*, 450 F.3d 1295, 1307 (11th Cir.2006). The Temple bears the initial burden of producing *prima facie* evidence to support a claim alleg-

9. Although there are other Buddhist temples in Garden Grove, each of the venerable presiding monks of the various temples instructs followers in their own teachings and disciplines. Doan Decl. ¶ 13. If the congregants of the Temple were forced elsewhere to practice their Buddhism, they would be essentially switching to a new path of spiritual worship. This is not a desirable solution for many of the Abbot's followers. *Id.* Also, because many believe that the Temple houses the spirits of their ancestors, to go to another temple would be to abandon those ancestors. Dang Decl. ¶ 10.

ing an equal terms violation. *See* 42 U.S.C. § 2000cc–2(b). Once the plaintiff satisfies that burden, the city bears the ultimate burden of persuasion on all elements of the claim. *See id.* If a city's zoning laws are found to violate the equal terms provision, they may still be upheld if the government establishes that the law embodies the least restrictive means of achieving a compelling government interest. *Primera Iglesia,* 450 F.3d at 1308. "To satisfy the commands of the First Amendment, a law restrictive of religious practice must advance interests of the highest order and must be narrowly tailored in pursuit of those interests." *Lukumi,* 508 U.S. at 546, 113 S.Ct. 2217 (internal quotations omitted).

■ The Temple has put forth sufficient evidence to make a *prima facie* claim alleging an equal terms violation. The Temple is a religious institution, and is subject to several land use regulations under the GGZO involving its use of the Chapwood Property. The GGZO, on its face, treats churches and religious centers on less than equal terms than it treats private clubs and other secular assemblies. It allows private clubs to operate without a CUP in the office professional zone, while religious assemblies are banned from that zone entirely. The GGZO also allows private clubs to operate without a CUP in the open space zone, while churches are subject to the CUP requirements. Indeed, private clubs and assemblies may operate, as a matter of right, in four of the City's ten zones, while churches are not permitted as a matter of right anywhere in Garden Grove.

The GGZO is substantially similar to the Surfside Zoning Ordinance ("SZO") that the Eleventh Circuit found violated the equal terms provision of RLUIPA. *Midrash Sephardi,* 366 F.3d at 1235. Churches and synagogues were permitted to operate in Surfside only by way of a CUP, and only in a residential district. *Id.* at 1219. Midrash Sephardi, an Orthodox Jewish synagogue, sought to operate a worship facility in Surfside's business district. *Id.* at 1220. Among the uses permitted by the SZO in the business district were private clubs and lodge halls. *Id.* Churches and synagogues were entirely prohibited from the business district. *Id.* The Eleventh Circuit found that the differential treatment between religious assemblies and private clubs and lodges resulted in a facial violation of RLUIPA. *Id.* at 1231. The Court subjected the SZO to strict scrutiny, and found "no evidence that private clubs and lodges *actually* contribute to the business district in a way appreciably different than religious institutions." *Id.* at 1234 (emphasis in original). The Court found that the treatment of synagogues as categorically different than secular assemblies "indicates that [the zoning ordinance] pursues Surfside's interests only against conduct motivated by religious belief." *Id.* at 1235. The zoning ordinance thus failed to survive strict scrutiny, and was struck down. *Id.*

As in *Midrash Sephardi,* Garden Grove's facial differentiation between religious and nonreligious assemblies subjects the GGZO to strict scrutiny. The City must show that the distinction made is the least restrictive means of furthering a compelling interest. On the record before the Court, there is a serious question about the City's ability to meet this standard. The primary concerns raised in the City Planning Commission's denial of the Temple's applications were increased traffic, increased on-street parking, and loss of revenue. These three concerns simply do not justify facially unequal treatment between a church and a private club. For example, a private association or meeting facility located at the Chapwood Property could have an identical effect on traffic and parking as would the Temple's proposed

uses.[10] Similarly, if a tax exempt non-profit private organization decides to purchase property in the office professional zone, the City would suffer the same loss of revenue as it would if a religious association operated the property as a church. The City has not shown that a church or religious assembly would have a demonstrably different impact on the office professional zone than would a private club or lodge. This strongly suggests that the zoning ordinance impermissibly pursues Garden Grove's interests only against conduct motivated by religious belief.

The City's failure at this stage in the proceedings to articulate a compelling interest that requires it to treat churches and religious assemblies differently than private clubs does not foreclose it from ultimately doing so at trial. The City may also attempt to prove that the Temple is not similarly situated to the non-religious assembly uses permitted as of right in the office professional zone. However, the Temple successfully raises at least a serious question going to the merits of its equal terms claim. Given that the balance of hardships tips heavily in the Temple's favor, the presence of this serious question is sufficient to warrant the issuance of an injunction.

**B. Scope and Content of the Preliminary Injunction**

The preliminary injunction issued by the Court will grant the Temple the right to use the Chapwood Property for certain religious services. The Temple's use of the property will be subject to the restrictions and regulations that are applicable to all similarly situated uses in the office professional zone. Religious and nonreligious assembly will be limited to six designated rooms and suites. Use of the re-mainder of the facility will be governed by the regulations contained in the California Building Code for a property with a "B" occupancy designation. The Abbot and the *sangha* will be permitted to perform the services described in the daily schedule submitted to the Court, and members of the lay congregation will be able to participate along with the monastics when appropriate. Use of the facility will be limited to religious and general administrative purposes; it shall not be used as a residence by any person, and no one will be allowed to sleep overnight at the property. This injunction will remain in force until a final determination on the merits is issued in this case. Any alleged violations of the injunction may be brought to the attention of the Court by either party, and the Court will determine the appropriate remedy.

**IV. CONCLUSION**

For all the foregoing reasons, the Court hereby preliminarily enjoins the City from enforcing those provisions of the Garden Grove Municipal Code enumerated in the injunction against the Temple, the Abbot, and his congregation. The Temple, the Abbot, and his congregation may peaceably practice their Buddhist faith at the Chapwood Property immediately.

**ORDER ISSUING PRELIMINARY INJUNCTION**

Plaintiffs Vietnamese Buddhism Study Temple in America (a/k/a Chua Quan Am) (the "Temple") and Abbot Thich Dao Quang (a/k/a Tri Nguyen Thich) (the "Abbot") seek a preliminary injunction to suspend the enforcement of sections 9.08.030, 9.08.050, and 9.24.030 of the Garden Grove Municipal Code. After carefully consider-

---

**10.** The traffic study commissioned by the Temple indicated that the use of the Chapwood Property as a temple and monastery would actually result in less traffic than when the property was operated as a medical office facility. Compl. Ex. A.

ing the evidence presented by the parties, the Court finds an injunction is appropriate and necessary. *See* Order Granting Plaintiffs' Motion for Preliminary Injunction, October 20, 2006.

It is hereby ordered that the City of Garden Grove ("City" or "Garden Grove"), as well as its officers, agents, servants, employees, and attorneys and those persons in active concert or participation with them who receive actual notice of the preliminary injunction order, is restrained and enjoined from enforcing, by any means, including threatened enforcement, citation, and/or fining, Sections 9.08.030, 9.08.050, and 9.24.030 of the Garden Grove Municipal Code with respect to the use by the Temple and its various members and representatives of the property located at 10510 Chapman Avenue in Garden Grove ("Chapwood Property"), subject to the following provisions:

(1) The Temple is permitted to use the following suites, portions of suites, or rooms, located in the existing one-story building located at the Chapwood Property for assembly purposes, whether religious or non-religious, subject to the following maximum occupancy limits:

(A) Suite 1200, referred to as the main worship hall, with a maximum occupancy of 49 persons;

(B) The portion of Suite 400 referred to as the Tea Room and designated as Suite 400A, with a maximum occupancy of 15 persons;

(C) The portion of Suite 400 referred to as the Conference/Visitors' Room and designated as Suite 400B, with a maximum occupancy of 15 persons;

(D) The portion of Suite 1000 referred to as "the breakfast area" and designated as Suite 1000A, with a maximum occupancy of 15 persons;

(E) The portion of Suite 1300 designated as Suite 1300A, with a maximum occupancy of 10 persons;

(F) The portion of Suite 1300 designated as Suite 1300B, with a maximum occupancy of 10 persons.

(2) The Temple shall not exceed the maximum occupancy requirements of the suites, portions of suites, or rooms identified in Paragraph 1(A) through (F) above.

(3) The suites portions of suites, or rooms not specifically identified for assembly in Paragraph 1(A) through (F) above remain subject to applicable California Building Code requirements for a building with a "B" occupancy designation.

(4) Within 1 day after issuance of this order, in each suite, portion of suite, or room designated for assembly in Paragraph 1(A) through (F) above, the Temple shall conspicuously post, in English and Vietnamese, the designated suite number and maximum occupancy therein. These notices may be prepared on a personal computer.

(5) Within 5 business days after issuance of this order, the Temple shall submit to the City a rough site plan showing the location and suite numbers, including any letter designations, for each of the suites, portions of suites, or rooms designated for assembly in Paragraph 1(A) through (F) above.

(6) No person shall be permitted to spend the night at the Chapwood Property.

(7) There shall be no cooking on the property with an open flame or stove.

(8) The Temple is permitted to have and use a refrigerator, microwave, coffee machine, electric tea kettle, toaster, and electric rice cooker. Any electric rice cooker used by the Temple must be equipped with an automatic shut-off feature.

(9) Within 5 business days after issuance of this order, the Temple will apply for an open candle permit from the Garden Grove Fire Department.

(10) By the close of the first business day following issuance of this order, the Temple will provide keys for all gates and exterior locks to be placed in the Knox Boxes at the Chapwood Property.

(11) The Temple will make no un-permitted structural modifications to the building on the Chapwood Property.

(12) Within 30 days after issuance of this order, the Temple will submit to the City a floor plan of the areas of the building located at the Chapwood Property that will be used by the Temple for any purpose. This floor plan will be drawn by a professional architect in accordance with the standards of that profession and accurately depict all existing exits.

(13) Within 30 days after the submission of the plans, the Temple will complete all improvements necessary to bring the occupied rooms and/or areas into compliance with applicable California Building Code requirements for buildings with a "B" occupancy designation. These improvements may include, but are not limited to, such things as panic bars on exterior doors and gates, exit signs, and exit lighting.

(14) This injunction will remain in force until a final adjudication is rendered on the merits of this lawsuit, subject to modification by the Court as justice requires. If either party seeks modification or revocation of the injunction, on any grounds, that party must request such relief from the Court.

It is further ordered that the Temple is not required to post a bond. This order shall become effective immediately.